UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SHARON MEIER, *as Guardian*
*and Conservator of Paul Meier,*

        Plaintiff,

                                        Case Number 07-13760-BC

v.                                       Honorable Thomas L. Ludington

COUNTY OF PRESQUE ISLE, *et al.*,

        Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Sharon Meier's ("Plaintiff") amended complaint alleges that Defendants are responsible for injuries sustained by her husband, Paul Meier ("Meier"), when he was in custody of Presque Isle County Sheriff's Department (the "Department"). The parties generally agree that Meier, arrested for operating a vehicle under the influence of alcohol, was injured when an alcohol-induced seizure caused him to fall off a jail-cell bed and strike his head on the floor.

Plaintiff's amended complaint seeks damages pursuant to 42 U.S.C. § 1983 for violation of Meier's Fourteenth Amendment right to medical care. Plaintiff first alleges that the decision to admit Meier into the Presque Isle County Jail (the "Jail"), rather than transfer him to a medical facility demonstrated a deliberate indifference to his serious medical need. Second, Plaintiff asserts that the officers response after Plaintiff's seizure demonstrated a deliberate indifference to his serious medical need when they did to move Meier to assist his breathing. Third, Plaintiff contends that the Jail's staff was improperly trained to assist an intoxicated inmate. Finally, Plaintiff maintains that the municipality adopted an informal policy to provide inadequate medical care to intoxicated inmates.

On October 23, 2008, Defendants moved for summary judgment and the parties presented

oral argument on January 27, 2009.  While Plaintiff has arguably met her burden of demonstrating

that Meier had an objective need for medical care, she has not advanced sufficient evidence that

Defendants recklessly disregarded an appreciated and serious medical risk.  In addition, Plaintiff has

not met her burden of demonstrating that the municipality adopted an unconstitutional custom or

failed to adequately train the Jail's custodians.  Thus, the Court will **GRANT** Defendant's motion

for summary judgment.

I

A

Just after noon of September 17, 2006, Meier drove his automobile into a ditch and through

a fence.  *See generally* dkt. # 47-10 at 2-4 (September 17, 2006 Incident Report).  Defendant Deputy

Christopher Flewelling ("Defendant C. Flewelling") investigated the accident scene and deduced

that Meier, who departed the scene on foot, was the driver of the vehicle.  Defendant C. Flewelling

located Meier at a nearby residence.  Upon questioning, Defendant C. Flewelling "detect[ed] a

strong odor of 'beer' and 'booze' emitting from [Meier's] breath and bodily odor."  He also

observed that Meier's eyes were "glossy" and he was shoeless.  Meier explained the circumstances

of the accident to Defendant C. Flewelling, including the fact that he had consumed four or five

beers before the accident.  Meier stated that he had not consumed any alcoholic beverages after the

accident, but acknowledged that he had consumed whiskey the night before and vodka on the

morning of the accident.  Defendant C. Flewelling also observed a bottle of vodka on the kitchen

table of the residence.

Defendant C. Flewelling then conducted a series of field sobriety tests.  Meier was unable

-2-

to recite the "ABC's" and declined to attempt the "stork stance." Rather, Meier acknowledged that he was intoxicated. Based on the foregoing, Defendant C. Flewelling placed Meier under arrest for operating a vehicle under the influence of alcohol ("OUI") and driving with a suspended licence. Defendant C. Flewelling also inquired "if [Meier] was under any doctor's care or supervision" or if Meier was diabetic. Meier told the officer no to both questions. Throughout their interaction, Defendant C. Flewelling understood Meier, but acknowledged Meier's speech was "slurred." Dkt. # 47-7 at 4 (C. Flewelling Depo.). Meier was able to walk unassisted and followed the officer's instructions.    Defendant C. Flewelling transferred Meier to the Jail, where he administered a breath analysis test on Meier at approximately 2:54 p.m. Meier registered a blood alcohol content ("BAC") of 0.31. Meier refused a second breath analysis test. Defendant C. Flewelling considered the 0.31 BAC to be "pretty high," but did not believe that Meier needed medical attention. *Id.* at 9. With respect to seeking doctor supervision, Defendant C. Flewelling indicated that he deferred to the judgment of the corrections officer. *Id.*

After the BAC test, the clerk corrections officer, Defendant Renee Szymanski ("Defendant Szymanski"), processed Meier for admittance to the Jail. Defendant Szymanski completed an initial screening report,  an alcohol questionnaire, and a medical screening interview with Meier. The initial screening report indicates that Meier understood questions, had red or bloodshot eyes, walked with a stagger, spoke with slurred speech, and omitted an odor of alcohol. Dkt. # 47-13 (Initial Screening Report). Meier indicated that he drank beer daily and that he experiences "slight shaking" when he stops drinking. Dkt. # 47-14 (Alcohol Questionnaire). Upon visual observation of Meier, Defendant Szymanski concluded that Meier did not require emergency service or exhibit signs of alcohol withdrawal. Dkt. # 47-15 (Medical Screening Report).

-3-

The Jail's correction officers maintained a written log[1] of the inmates activities.  At 3:10 p.m., Defendant Szymanski noted as follows:

> Booked; a-5900 Meier, Paul Ct I OWI Ct II DWLS and hold for Macomb Co. BAC .31 Subj very cooperative and states he drinks daily-may get the tremors.  Contacted Dr. [Allum] ref his BAC and states to keep an eye on him, but if he is walking and talking, he should be ok.

Dkt. # 47-16 at 1 (September 17, 2006 Daily Activity Log) (all capitalization omitted and shorthand in original).  At 3:30 p.m., Defendant Szymanski noted that "Meier out of shower – smelt like a booze bottle.  Placed him back in cell.  He would like his phone call later."  *Id.*  At 4:00 p.m., Defendant Szymanski observed Meier laying on a mat and Meier "got up to eat" at 4:25 p.m.  *Id.*  At 8:15, Defendant Szymanski took Meier out of his holding cell to be fingerprinted and photographed.  *Id.*  She noted that Meier was "already shaking."  *Id.*  At 8:25 p.m., Defendant Szymanski returned Meier to his holding cell, noting that Meier's BAC was 0.217.  At 10:50 p.m., Defendant Szymanski observed that Meier had "been sleeping all evening other than getting up for dinner, prints, etc."  *Id.*

At her deposition, Defendant Szymanski acknowledged that she had sought medical attention for an intoxicated inmate in the past.  Dkt. # 47-9 at 3 (Szymanski Depo.).  In that circumstance the inmate had exhibited slurred speech, poor motor skills, and an inability to walk or stand without assistance.  *Id.*  With respect to Meier, Defendant Szymanski contacted Dr. Robert Allum ("Dr. Allum") because Meier's BAC exceeded 0.30.  She described the conversation as follows:

> I told him that I had, a gentleman.  I gave him his age; told him that he had a high [BAC] of a .31.  He then goes through some questions with me, is he able to speak, is he making sense, can he walk, can he carry on a conversation with you, does he

---

[1]  The log is divided into eight-hour shifts and maintained by the corrections officer on duty.  The logging officer will be noted.

know his whereabouts.  And he then makes the decision whether or not he needs to be treated.

*Id.* at 4.  She indicated that Meier was able to perform each of those activities and did not "show any signs of any medical problems."  *Id.*  Defendant Szymanski conversed with Meier continually throughout her shift, and his demeanor did not suggest a need for medical attention.  *Id.* at 5-6.

At approximately 11:00 p.m., Defendant Szymanski finished her shift and corrections officer Lois Klann ("Officer Klann") began her shift.  Dkt. # 47-16 at 2.  Prior to departing, Defendant Szymanski and Officer Klann checked the cells.  Officer Klann noted that she was advised that Meier was in the tank and that his BAC remained "too high."  *Id.*  Officer Klann remained on duty until 7:00 a.m. on September 18, 2006.  *Id.*  She noted that all inmates were okay throughout the early morning of September 18.  *Id.*

At approximately 6:55 a.m., another corrections officer, Defendant Wendy Berg ("Defendant Berg"), began her shift.  To begin her shift, Officer Klann and Defendant Berg conducted a head count of the inmates.  Dkt. # 47-16 at 3.  Defendant Berg indicated that she was "advised of subject in holding for OWI."  *Id.*  Defendant Berg does not recall, however, she was informed that Dr. Allum advised Defendant Szymanski to "keep an eye" on Meier.  Dkt. # 47-8 at 6 (Berg Depo.).  At 10:55 a.m., Defendant Berg noted that "Meier is starting to feel really bad, thought it was from coming off of the alcohol."  Dkt. # 47-16 at 3.   According to Defendant Berg's deposition*,* she described the circumstances surrounding this statement as follows:

> I believe when I went by to make my head count, he was sitting up awake, where he had been – except for when he got up for breakfast, had been lying down most of the morning.  And conversationally, I just went by and asked him how he was feeling, and he said he was starting to feel bad.  And I asked him if he thought it was due to coming down from the alcohol, and he said yes, he believed that's what it was.

Dkt. # 47-8 at 2.  Meier did not appear to be shaking or trembling to Defendant Berg.  *Id.* at 2-3.

At 1:15 p.m., the male inmates were offered "yard time," which Meier did not participate. Dkt. #
47-16 at 3. Instead, Meier was lying down, facing a wall. Dkt. # 47-8 at 3. At 1:32 p.m., Defendant
Berg found Meier lying face down on the floor. Dkt. # 47-16 at 3. Defendant Berg's log entry
described the incident as follows:

> As I was heading to front office, noticed something orange on the floor in holding,
> went over to holding and Meier was lying on the floor, I yelled for him several times
> with no response, then noticed blood on the floor next to his head and could hear that
> he was breathing but he was probably breathing in blood. Asked dispatch for an
> officer to come back and received no response, I then went to the door and asked
> Investigator Porter to come back. He went into cell and told me to get an ambulance.
> Asked dispatch to page an ambulance, Porter did not want to move him, not knowing
> how he got there. U/S Paschke came back and went into holding with Investigator
> Porter and both tried to get a response from Meier with no success.

*Id.*

Defendant Deputy Stephen Porter ("Defendant Porter") assisted at Defendant Berg's request

Defendant Porter entered the holding cell and observed Meier lying face down in a pool of blood.

Dkt. # 47-18 at 4. Upon observing Meier on the ground, Defendant Porter instructed Defendant

Berg to call an ambulance. Dkt. # 47-18 at 4. Defendant Porter acknowledged that Meier was

breathing, but unconscious. Dkt. # 47-18 at 4. Defendant Porter was prepared to administer CPR,

if necessary. Dkt. # 47-18 at 4. At that point, Defendant Undersheriff Robert Paschke ("Defendant

Paschke") arrived, observing Meier breathing and "gasping for air." Dkt. # 47-19 at 12. Neither

officer moved Meier because they anticipated the ambulance to arrive in two minutes and feared that

moving Meier may cause blood to pool in his airways or cause further injury. Dkt. # 47-18 at 4-5;

dkt. # 47-19 at 12-13.

At approximately 2:00 p.m., an ambulance transferred Meier to the Alpena Regional Medical

Center. Doctors diagnosed Meier with acute respiratory failure and multiple lacerations on his face,

in his mouth, and on his leg.  It was also determined that Meier had suffered a seizure and a head injury.  Meier remained comatose for approximately six months.

B

Plaintiff emphasizes two Department policies to be relevant in this circumstance.  First, a 2005 policy (G.O. # 034) states in pertinent part the following:

> Policy:
>
> The purpose of this order is to establish a responsible policy and procedure for processing subjects who have been arrested for OUIL (Operating a Motor Vehicle While Under the Influence of Intoxicating Liquor).
>
> Procedure:
>
> The corrections officer will, upon notification by police officer that they are en route with an [OUIL] suspect:
>
> * * *
>
> 4.    If the subject that has been arrested has blown a .30 or above on the breathalyzer, have the arresting officer(s) transport the subject to a Medical Facility and have him/her checked by a physician, before we accept inmate.
>
>     a.    Under no circumstances will you place a subject in the tank who has blown a .30% or above, who has not been checked by a physician.

Dkt. # 47-4.  Defendant Szymanski was aware that such a policy existed.  Dkt. # 47-9 at 4. Defendant C. Flewelling was also aware that some policy was in place, but deferred to the judgment and procedure employed by Defendant Szymanski.  Dkt. # 47-7 at 9.  Defendant Berg believed the Department's policy required that a detainee with a BAC exceeding 0.30 receive "medical clearance" before being placed in the Jail.  Dkt. # 47-8 at 5.

Plaintiff also emphasizes the Department's "Inmate Screening – Substance Abuse" policy (G.O. # 031). It provides as follows:

-7-

Policy:

In order to insure the safety and welfare of inmates being admitted, Correctional Officers will screen all inmates for possible emergency mental health and substance abuse problems.  When personnel conclude that an inmate is in need of immediate professional help, they will advise the Sergeant, Undersheriff and/or Sheriff.

Procedure:

1.     The duty correctional officer will screen all inmates being admitted for possible substance abuse problem and will:

   a.     Observe the inmate's physical condition.
   b.     Inquire whether the inmate was drinking or taking any drugs before his/her arrest.
   c.     Conduct a PBT test to determine if the inmate has been drinking (Only for inmates who are suspected to have been drinking).

2.     The duty correctional officer will immediately arrange for [an] inmate to receive medical treatment if the inmate appears to be displaying withdrawals, such as abdominal pain, has the sensations of something crawling on his/her skin, or has hallucinations.

3.     If [an] inmate appears to be intoxicated but is not displaying any signs of drug or alcohol withdrawal, the duty [c]orrectional officer will place inmate into the holding cell, and observe the inmate closely.

4.     The on duty correctional officer will not accept an arrested subject if he/she feels that the arrested subject is too intoxicated, or is in need of medical treatment due to his/her injuries before his or her arrival at the [Jail].

                         *   *   *

6.     The correctional officer will make an entry into the jail log and prisoner's admission card documenting all action taken to insure the safety of intoxicated inmates.

7.     The correctional officer will insure that the on-coming shift is informed and understands all procedures to be carried out to insure the safety of intoxicated inmates.[2]

---

[2]  While Plaintiff has attached a copy of the policy as Exhibit C to the courtesy copy of her response brief, it was not electronically filed on the docket.  Thus, no citation is provided.

C

Plaintiff also offer the affidavit of Michael F. Doyle, III, D.O. ("Dr. Doyle"), a board-certified physician in the field of internal medicine with experience with alcohol withdrawal syndrome ("AWS").  Dkt. # 47-24 at ¶¶ 2-6 (Doyle Aff.).  AWS "is a set of symptoms seen when an individual reduces or stops alcohol consumption after a prolonged period of excessive alcohol intake."  *Id.* at ¶ 8.  Dr. Doyle opines that AWS has up to a five-percent mortality rate, with symptoms including hypertension, increased heart rate, rapid breathing, and increased body temperature.  *Id.* at ¶¶ 9-10.  Dr. Doyle asserts that Meier's slurred speech and bloodshot eyes were indicators of AWS.  *Id.* at ¶ 17.  The period of highest risk for AWS is eighteen to thirty-six hours after the person stops drinking.  *Id.*  Dr. Doyle believes that Defendants ignored a clear indicator of AWS – tremors.  *Id.* at 17(d).  Dr. Doyle believes had Meier's vital signs been checked that it would have been apparent that he was suffering from AWS.  *Id.* at 17.  Ultimately, Dr. Doyle opines that Meier's physical injuries occurred from an AWS-caused seizure.  *Id.*

Dr. Allum offered a contrary opinion concerning the appropriate care of a person with an elevated BAC.  A board-certified family practitioner and medical review officer, Dr. Allum did not view shaking or tremors to be "particularly dangerous or indicative of any imminent danger."  Dkt. # 47-17 at 5 (Allum Depo.).  In addition, Dr. Allum opined that a high BAC, in and of itself, does not suggest a need for hospitalization.  *Id.* at 5-6.  Dr. Allum also testified that a decreasing BAC is an indicator that the person does not require medical care.  *Id.* at 11.  While Dr. Allum did not recall Meier's circumstance, he testified that a person that was able to communicate and walk, and may get tremors from drinking does not require emergency medical care or medicine.  *Id.* at 6, 10.

II

Under Federal Rule of Civil Procedure 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002). The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).

The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. "[T]he party opposing the summary judgment motion must do more than simply show that there is some metaphysical doubt as to the material facts." *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Pierce v.*

-10-

*Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (quotations omitted)).

III

Plaintiff's amended complaint alleges two counts for violation of 42 U.S.C. § 1983, but Plaintiff's response brief advances four predicates for violation of Meier's constitutional rights. First, Defendants' care was deliberately indifferent to Meier's serious medical need. This claim divides into two groups of defendants – certain Defendants' decision not to procure medical treatment before the injury in the holding cell and the other Defendants' response when finding Meier unconscious on the floor.[3] Plaintiffs also allege that Defendant County and Defendant Sheriff are liable for insufficient training of staff, dkt. # 24 at ¶¶ 54-56, and maintaining an unconstitutional custom of depriving intoxicated inmates of adequate medical care. *Id.* at ¶¶ 61, 63-66.

Defendants' motion for summary judgment advances three compelling arguments. First, Plaintiff has not advanced a legitimate factual basis for the assertion that the individual defendants' conduct was objectively and subjectively deliberately indifferent to Meier's serious medical need. Second, Plaintiff has not established a constitutional violation to buttress the failure to train claim. Third, Plaintiff has not established that Defendants had a practice of calling Dr. Allum rather than transferring an intoxicated inmate to a medical facility to be an unconstitutional custom.

A

The parties generally agree on the applicable legal standards and guiding authority. As a

---

[3] Aside from their substantive legal arguments, Defendants contend that this theory of liability was not raised in the amended complaint. The amended complaint alleges "[t]hat [Meier]'s injuries could have been avoided had adequate medical care been provided by Defendants while incarcerated." Dkt. # 24 at ¶ 38; *see also* dkt. # 24 at ¶¶ 50-51. Under the applicable notice pleading standard, this general allegation is sufficient to place Defendants on notice that their medical response after Meier became unconscious could also serve as a basis for 42 U.S.C. § 1983 violation.

starting point, Plaintiff has alleged facts that establish a prima facie claim under 42 U.S.C. § 1983, which are the deprivation of a constitutional right by a person acting under the color of law. Moreover, the Due Process Clause of the Fourteenth Amendment protects a pre-trial detainee from the deliberate indifference of serious medical needs by correctional officers when in custody. *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 539 (6th Cir. 2008). A plaintiff must demonstrate an objective and subjective component. *Id.* The *Phillips* court explained the objective component as follows:

> The objective component requires a plaintiff to show the existence of a sufficiently serious medical need. We have previously explained that where a plaintiff's claims arise from an injury so obvious that even a layperson would easily recognize the necessity for a doctor's attention, it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame.

534 F.3d at 539-40 (citations, quotations, brackets, and ellipses omitted). An officer is constitutionally bound to seek medical attention for a detainee's "obvious and serious need for medical treatment." *Blackmore v. Kalamazoo County*, 390 F.3d 890 899 (6th Cir. 2004) (officer's denial of medical care met objective and subjective components in denying medical treatment to prisoner suffering from appendicitis). As Plaintiff emphasizes, this circuit acknowledged that delirium tremens is an "objectively serious" "medical threat." *See Speers v. County of Berrien*, 196 F.App'x 390, 394 (6th Cir. 2006) (unpublished) (expert testimony that the plaintiff suffered from potentially fatal condition satisfied objective component).

Here, Dr. Doyle's affidavit contrasted against Dr. Allum's deposition testimony highlights the factual dispute concerning the objective element. Dr. Doyle opines that Plaintiff exhibited signs of AWS, including a BAC exceeding 0.30, slurred speech, bloodshot eyes, and tremors. In addition, Dr. Doyle indicates that additional symptoms – e.g., hypertension and increased heart rate – likely

-12-

went unrecognized because Meier was not examined by a medical professional.  Dr. Doyle also opines about the serious nature of Meier's condition.  Dr. Allum, on the other hand,  interpreted the severity of those symptoms differently.  The dispute between the professionals, buttressed by Defendant County's policy, highlights a legitimate question of fact about whether Meier faces a serious medical need and the need for attention.  Plaintiff has created a factual dispute with respect to the objective component.

With respect to the subjective component, "deliberate indifference describes a state of mind more blameworthy than negligence . . . in diagnosing or treating a medical condition."  *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  Yet, it "li[es] somewhere between the poles of negligence at one end and purpose or knowledge at the other . . . ."  *Id.* at 836.  The *Phillips* court provided the following overview of the subjective component:

> In contrast, the subjective component requires a plaintiff to allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk.  Although the latter, subjective standard is meant to prevent the constitutionalization of medical malpractice claims, a plaintiff need not show that the officer acted with the specific intent to cause harm. Indeed, deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.  Officials, of course, do not readily admit this subjective component, so it is permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge.

534 F.3d at 540 (citations, quotations, and brackets omitted).

Here, Defendants deny appreciating the risk of a serious medical need.  Thus, the inquiry is whether the record, viewed in the light most favorable to Plaintiff, supports the inference that any of Defendants knew and disregarded "an excessive risk to inmate health or safety." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (citation and quotation omitted). Thus, the burden lies with Plaintiff to demonstrate  "facts from which the inference could be drawn that a substantial risk of

-13-

harm exists, and he must also draw the inference." *Id.*

With respect whether Defendants subjectively appreciated a serious risk, the parties offer competing interpretations of three cases that involved intoxicated inmates. *Speers v. County of Berrien*, 196 F.App'x 390, 394 (6th Cir. 2006) (unpublished); *Fielder v. Bosshard*, 590 F.2d 105 (5th Cir. 1979); *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419 (11th Cir. 1997). Indeed, the record demonstrates that Defendants appreciated that Meier was heavily intoxicated – e.g., a 0.31 BAC, slurred speech, shaking, and bloodshot eyes. However, as Dr. Allum emphasized, these indicators may be associated with general alcohol withdrawal as well as AWS. General alcohol withdrawal is a condition that may usually be managed in a prison environment, not requiring extensive medical care. *Speers*, 196 F. App'x at 395. Meier's exhibited symptoms and conduct that did not necessarily reflect a serious medical condition such as the detainee in *Fielder* and the circumstance in *Lancaster*.

In *Fielder*, the detainee exhibited behavior consistent with someone experiencing hallucinations, apparently requested the assistance of a doctor, and was suffering from delirium tremens. 590 F.2d at 108. Moreover, the jailor appreciated the circumstance and communicated it to superiors, but noone took any action. *Id.* The Fifth Circuit concluded that the record supported a jury's finding that the officers were deliberately indifferent because they appreciated the "extremity of [the detainee's] illness" and exhibited hostility towards the inmate. *Id.* As noted by the court, "[t]here is a vast difference between an earnest, albeit unsuccessful attempt to care for a prisoner and a cold hearted, casual unwillingness to investigate what can be done for a man who is obviously in desperate need of help." *Id.*

In *Lancaster*, the detainee's wife warned officers that the detainee was a chronic alcoholic

-14-

with a recent history of near-fatal seizures and would likely suffer from another seizure if without alcohol or medication.  116 F.3d at 1426-27.  Moreover, none of the officers sought medical treatment until the detainee actually experienced a seizure, despite appreciating that delay would exacerbate the condition.  *Id.*  Ultimately, the warnings by detainee's wife demonstrated that the officers were aware of a serious condition, yet delayed seeking medical treatment until a seizure occurred.  *Id.* at 1427-28.

The record before the Court does not support the inference that any of the individual officers recklessly disregarded an appreciated risk to Meier.  For the purpose of this inquiry, each defendant is evaluated independently without imputing the knowledge of fellow officers.  *Speers*, 196 F. App'x at 394 (citing *Clark-Murphy v. Foreback*, 439 F.3d 280, 291(6th Cir. 2006) and *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005)).

i

With respect to the arresting officer, Defendant C. Flewelling, Plaintiff has not created a factual dispute that he recklessly disregarded a serious need for medical treatment.  First, at the time of the arrest, Meier's conduct did not suggest that he required medical care.  While visibly intoxicated and with slurred speech, Meier was cooperative, able to walk unassisted, and understood the officer's commands and inquiries.  Meier also denied being under doctor's care for a medical condition.  Upon arrival at the Jail, Defendant C. Flewelling acknowledged that Meier's BAC was "pretty high," but concluded Meier's demeanor and functional abilities did not demonstrate a need for medical care.  Moreover, Defendant C. Flewelling deferred to the judgment of Defendant Szymanski, which is reasonable considering a booking clerk would regularly confront inebriated detainees.  At his deposition, Defendant C. Flewelling recited the facts that Meier was coherent, able

-15-

to communicate, able to walk unassisted, and denied any inquiry into medical care. While Meier exhibited signs of a high level of intoxication, there is no indication that Defendant C. Flewelling appreciated the medical risk to Meier. Indeed, Dr. Doyle's affidavit indicates that the period of risk associated with AWS begins eighteen hours after drinking ceases. Defendant C. Flewelling's contact with Meier was within a few hours of his drinking. The record does not reflect the fact that Defendant C. Flewelling appreciated a medical risk to Meier or consciously disregarded that risk.

ii

Next, the record indicates that Defendant Szymanski's response was not deliberately indifferent. As discussed above, Meier exhibited symptoms that could be associated with AWS or general alcohol withdrawal. Defendant Szymanski noted that Meier slept most of the day, which is consistent with general alcohol withdrawal. *See Speers*, 196 F. App'x at 395. Defendant Szymanski also observed a decrease in Meier's BAC from 0.31 to 0.217 over approximately a six-hour period.

While Plaintiff emphasizes that Defendant Szymanski observed Meier "shaking" ( in Plaintiff's view correctly diagnosed as delirium tremens), this does not demonstrate that she subjectively disregarded an excessive risk. During intake, Defendant Szymanski asked Meier a series of medical questions, to which Meier indicated that he experienced "slight shaking" when he stopped drinking. While Dr. Doyle and Dr. Allum reached different opinions about whether this symptom required medical care, there is no indication that Defendant Szymanski appreciated the severe implications of this symptom. Dr. Allum instructed her to keep an eye on Meier, which she did. He also indicated that Meier would be fine as long as Meier was "walking and talking." Defendant Szymanski observed Meier to be conversing, moving around, and waking to eat. Thus,

-16-

when Defendant Szymanski observed Meier to be shaking, it was not unreasonable for her to conclude this was a normal consequence of Meier's sobering up.

Plaintiff stresses that Defendant Szymanski disregarded internal policies governing the care of intoxicated detainees.[4]  As the corrections officer, the policy directed to have the "arresting officer transport the [detainee] to a Medical Facility and have [the detainee] checked by a physician . . . Under no circumstances will [the officer] place a subject in the tank who has blown a .30% or above, who has not been checked by a physician."  Indeed, the record demonstrates that Defendant Szymanski was aware of the policy and Meier's BAC exceeded 0.30 , but did not direct his transfer to a medical facility.  Notwithstanding that decision, it is clear that she called Dr. Allum and explained the relevant circumstances of Meier's intoxication and continually monitored his behavior. In hindsight, it may have been preferable for Meier to be transferred to a medical facility, however, Defendant Szymanski did seek medical advice from Dr. Allum.[5]  Defendant Szymanski's lack of compliance with the policy might frame an issue of negligence, but not reckless disregard for a potential serious medical condition.

Moreover, another policy places discretion in the corrections officer to determine whether an intoxicated detainee requires medical assistance .  If a detainee experiences "abdominal pain, has the sensations of something crawling on his/her skin, or has hallucinations," then the policy directs an officer to "arrange for [an] inmate to receive medical treatment." Meier did not exhibit any of

---

[4]  Plaintiff generally asserts the existence of the policies supports a finding of deliberate indifference with respect to all officer Defendants.  However, the policies guide the conduct of the duty corrections officer responsible for screening inmates before intake, which in this case is Defendant Szymanski.

[5]  Although Plaintiff asserts that the injury would have been avoided had Meier been transferred to a medical facility, Dr. Allum opined that the local hospital would not have admitted Meier based solely on his level of intoxication. Dkt. # 47-17 at 5-6.

those symptoms, yet she still sought the counsel of Dr. Allum, a course not required by that policy. In fact, if the detainee does not "display[] any signs of . . . withdrawals," then the medical policy directs the correctional officer to place an intoxicated inmate into to a cell and under observation.

While Defendant Szymanski did not follow the procedures to the letter, it does not show that Defendant Szymanski was deliberately indifferent. Rather, the record demonstrates she affirmatively sought to determine whether Meier required medical assistance.   While Dr. Doyle disagrees with Dr. Allum's treatment, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976).

### iii

Likewise, a reasonable basis does not exist to conclude that Defendant Berg recklessly disregarded a serious risk to Meier's health.  Indeed, Meier indicated that he felt "really bad."  There is no indication that Meier asked for medical assistance or exhibited symptoms to Defendant Berg of a serious medical condition.  For example, Defendant Berg testified that he was not shaking.  The record supports a finding that Defendant Berg, nor Meier himself, appreciated the severity of his condition.  Moreover, Defendant Berg's conduct after Meier's apparent seizure and head injury supports the finding that she did not disregard Meier's health.  When she discovered Meier on the floor, she immediately sought help from fellow officers and summoned an ambulance.  There is no indication of a delay or attempt to deprive Meier of medical care after it was apparent that such care was required.

### iv

Finally, Defendants Paschke and Porter's conduct does not amount to reckless disregard. Plaintiff takes issue with their decision not to roll Meier over onto his back while lying in a pool of

blood.  However, the facts as available to them at the time, do not support a threshold case of reckless disregard of a medical risk.  First, each entered the scene with Meier already on the floor bleeding.  Defendant Porter indicated that he was concerned that rolling Meier onto his back may cause blood to drain into his throat and lungs, thereby, suffocating Meier.  Defendant Paschke testified that he was concerned that moving Meier may cause severe neck injuries.  Both are reasonable conclusions in the heat of the moment.  Moreover, each indicated that they were aware that an ambulance was en route and anticipated its arrival in a few moments.  Thus, Defendants Paschke and Porter's conduct, while perhaps negligent, was not reckless.

For these reasons, Plaintiff has not met her burden in raising the inference that any of the officer Defendants recklessly disregarded a known risk.  Thus, Plaintiff has not identified facts that Defendants violated Meier's constitutional right to medical care and Defendants are entitled to summary judgment.

Finally, Defendants' assertion of qualified immunity is not relevant to this circumstance. The qualified immunity analysis requires courts to evaluate whether, "[t]aken in the light most favorable to the party asserting the injury, [] the facts alleged show the [defendant's] conduct violated a constitutional right."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Then, "if a violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was clearly established."  *Id., see also Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999).

Here, the conclusion that Plaintiff has not raised an issue of fact concerning Defendant officers's subjective intent renders any request for qualified immunity moot, because no underlying constitutional violation exists.  *McKee v. Turner*, 124 F.3d 198 (table), 1997 WL 525680, *4 (6th

-19-

Cir. 1997) (unpublished).  In the alternative, had the record supported the inference that an officer subjectively disregarded the risk, then that officer would not be entitled to qualified immunity because "it would not make any sense to permit a prison official who deliberately ignored the serious medical needs of an inmate to claim that it would not have been apparent to a reasonable person that such actions violated the law." *Id.* (citing *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir.1992) and *Albers v. Whitley*, 743 F.2d 1372, 1376 (9th Cir1984)).  Consequently, deliberate indifference claims appear to be a unique circumstance where Supreme Court jurisprudence has mooted qualified immunity. *See id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 843 n. 8 (1994)) .

B

Next, because of the earlier conclusion with respect to the deliberate indifference claim, Plaintiff's failure to train and unconstitutional custom claims also lacks merit.  "If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *Watkins v.  City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001); *see also Floyd v. City of Detroit*, 518 F.3d 398, 411 (6th Cir. 2008) ("Where a court determines that no violation of the plaintiff's constitutional rights occurred, obviously the governmental entity cannot be liable for its failure to train or for developing a custom that led to a constitutional violation.").  Thus, Plaintiff's unconstitutional custom and failure to train claims do not survive summary judgment.

Likewise, "[a] supervisor is not liable pursuant to § 1983 for failing to train unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 543 (6th Cir. 2008).  Here, Plaintiff has not met her

-20-

burden in demonstrating unconstitutional conduct of Defendants under the supervision of Defendant

Sheriff.  Thus, Defendant Sheriff can not be held liable for under either theory and is entitled to

summary judgment.

IV

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment [Dkt. #] is

**GRANTED**.  Plaintiff's complaint [Dkt. # 24] is **DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington<br>
THOMAS L. LUDINGTON<br>
United States District Judge

Dated:  February 11, 2009

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 11, 2009.

s/Tracy A. Jacobs<br>
TRACY A. JACOBS